The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons subject to demeanor or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the court is now sitting. God save the United versus Kerr. Mr. Birch. Good morning, Your Honors. John Birch on behalf of Defendant Appellant Robert Kerr. I've reserved five minutes for rebuttal. That microphone is close to your ear. Is that better? I want to hear what you have to say. Okay. I've reserved five minutes for rebuttal. May it please the court. I'm sure your first question today is why this court should rule any differently now that the Supreme Court has GVR'd this case, and there are three reasons. To begin, the court's first two opinions both applied Blessing's nebulous multi-factor test, and the Talevsky opinion makes clear that court should not do that, and the Supreme Court GVR'd rather than simply denied our cert petition so that you would seriously reconsider. Second, Talevsky resolved what unambiguously conferred means. A statute must clear a demanding bar, a high bar, a significant hurdle. In other words, clear rights-creating language is atypical. None of those phrases... That's different than what you said because none of those phrases appeared in Gonzaga, which you relied on in part. You did say it couldn't be clearer, but actually Talevsky shows us how it could be clear. Well, here's how Talevsky talks about the atypical case in the context of FINRA, which was the statute at issue there. There, the substantive provisions were in a litany of requirements relating to residents' rights. In this case, we have a statute that speaks to the Secretary of Health and Human Services, directing her that a state plan must include 87 things, an aggregate focus, not a clear rights- Let me ask you a question about what has troubled me from this, about this case from the beginning, but why would the state go to such lengths to deny access to medical as apparently qualified, and I don't think there's ever been any dispute that the provider of the medical service is qualified to provide the service that the Medicaid recipient wants to receive. I don't understand why the state would go out of its way. The suit could have been avoided by allowing the Medicaid recipient access to the qualified health care that she seeks. Two responses to that, Judge Wilkinson. First, no one is being denied care. There are more than a hundred qualified providers within an easy drive of where Ms. Edwards lives where she could receive these services, so no one's being denied anything, and as to the qualifications- Maybe, but the statute is designed to provide freedom of choice among qualified providers, and so, for example, the federal statute doesn't say that providers can be excluded because of racial discrimination or because they select patients discriminating based on sexual orientation, and yet a state could reasonably exclude those providers, and that decision should be honored. Here, it's Planned Parenthood's choice. If they stop providing abortion services, they could be fully qualified, and it's the state's prerogative to make that policy decision. Nothing in the statute prevents that. I don't understand what this case has to do with abortion. It has nothing to do with abortion. It has to do with whether this statute creates such clear rights-creating language that it's atypical, that it gets past that significant hurdle, the high bar, whether it's a unicorn. I mean, consider the providing choice of provider provision in FINRA. That's the statute that the addressing in Talevsky. It says the right of each nursing home resident to choose a personal attending physician. That's the type of unicorn that we're looking for. In our statute, it simply says that individuals may obtain assistance from any qualified provider. That cherry-picked language, which is prefaced by the direction to the Secretary that the state plan must include these 87 provisions, is much less clear, much more ambiguous than the Is that true? There was a provision here that states that the Medicaid plan must provide that any individual eligible for medical assistance may obtain such assistance from any provider who is qualified to perform the services required. Now, the obligatory language there, the must, that verb, is fastened upon the state, and the permissive language is given to the Medicaid recipient. So you have this contrast here between must and may, and the state must make the service available, and this individual may, again permissive, obtain the assistance from any provider who is qualified. And it doesn't, it says any speaks directly here because the aim of the statute, the focus of the statute, the intended beneficiary of the statute, the rights that are conferred by the statute are conferred upon Medicaid recipients seeking medical care. So why isn't that rights enabling? For three reasons. First, this is a substantial compliance statute. So although it says must, if the state doesn't comply with all 87 of those things, and the Secretary does not withdraw funding or threaten to withdraw funding, it's entirely possible that a plan won't include some of those things. So that's number one. Number two, what did you just say now? It's a substantial compliance statute. So that means the state doesn't have to comply with all 87 things unless the Secretary of Health and Human Services threatens to withdraw funding. That's the nature of a statute that has an aggregate focus. The second reason is to compare this language. I understand that there's an administrative mechanism here, and it's a good point, and it's provided in two ways. First of all, the Secretary has to approve the plan, and then secondly, there's a fund cutoff mechanism, and there's a right of appeal on the fund cutoff. So I understand that there's an administrative mechanism here, but that in the Tulefsky case, there was administrative mechanisms too, and the court had opened to it to say where there's an administrative mechanism, there is no private right of action. It could have made a flat statement to that effect. That was open to it, but it didn't. I mean, it was certainly leery of a plan, but it had the opportunity to make the flat statement, which would be akin to saying that with spending clause legislation, there's no private right of action. But it stopped short of that, and it said that if we were to make that kind of flat statement, we would be adding a proviso in condition to 1983, which simply isn't there, and we would be putting words in Congress's mouth. I'll answer that question, and then if I could finish answering your previous question. Yeah, I'd like to hear the two other reasons. After you answer this question, I want you to go back and you said three reasons. I got the first one. Thank you, Judge Richardson. On this one, it's because here in our statute, the administrative appeal rights that Planned Parenthood has are followed by state court review, and so that means that you could have a claim brought by Planned Parenthood in the administrative process, which goes through the state court system, and then under Ms. Edwards' theory, she could have a 1983 claim going through the federal court system, and you would have the same facts in both cases. You'd be applying the same legal rule in both cases. Was this an acceptable decision as to who's a qualified provider? And you could end up with inconsistent results. That wasn't the case in Tlefsky. In this case, it's the kind of inconsistency that Tlefsky talked about as rebutting any presumption that clear rights were being You know, what are the reasons that this language here is not enough? And I was going to give you three. The first is that this is a substantial compliance statute, so all of this is at the discretion of the Secretary. The second point is that simply being... I'm trying to get the idea that it's a substantial compliance statute. That's 42 U.S.C. 1396 small c sub 2. It says that this is a substantial compliance statute. So the second reason is that being within a zone of interest, those people benefited by the statutory language is not enough. That's the first blessing factor, and the U.S. Supreme Court eschewed the blessing factors in Tlefsky and said that's not the test that we use. The third reason is contrasting the language here with the language in Tlefsky for choosing your choice of provider. This is in 42 U.S.C. 1396 small r f1. I'm sorry, that's the wrong provision. 42 U.S.C. 1396 r sub c 1 a 1. And it says that their beneficiaries have the right to choose a personal attending physician. That's the type of clear rights-creating language, the unicorn language, that passes the significant hurdle, the high bar, the demanding bar, that Tlefsky talks about. And that's not what we have here. Because the court cited blessing one time, not for its factors, but for another point. Well, in essence, they did, because blessing was... I'm asking you about essence. Did they overturn it? Did they explicitly overturn the blessing decision? I have to unpack that, because that's not a yes or no question. In this matter, there are three factors. Did essentially they collapse it into one? What they said in blessing was that the three factors were descriptive, not prescriptive. They were a tool. And in Tlefsky, the court said that... That doesn't sound like assuring to me, that if they say they are a tool... That's what blessing said, if I can finish my answer, Judge Wynn. Please do. In Tlefsky, the court said, the test, the only test that we apply is Gonzaga. Okay, so that means the blessing factors... They are moving more toward the textualist way of looking at the language of the statute. But blessing, in essence, did that. And the idea here was to collapse the three into one, but retain the... Don't you agree? I do not agree. In blessing... How do you differ from what I just said? I was about to explain. In blessing, three factors, Congress intended the provision benefit the plaintiff, not too vague and amorphous to be judicially enforced, speaks in mandatory terms. Those amorphous factors, Judge Stephens said they would have been satisfied in Gonzaga. The court in Tlefsky is saying... Who called them amorphous factors? The majority in Gonzaga. The language says amorphous factors. I'm not sure if that exact word is there, but they refer to them as mushy factors. I'm not sure because it's not there. I'm not sure because I don't recall whether that exact term is there. We will look that up. Can I ask a different question, counsel? Yes, Judge Rich. If I agree with... Assume for a minute that you could convince me that blessings factors no longer apply, and that I understand the arguments that you're making about why on a clean slate this language and these 87 factors don't create the type of individual rights that would have worked. What do you do with Wilder? Not the factors of Wilder, but the holding of Wilder. Wilder is applying and looking at the same structure. All three of the arguments that you raise would have led to the opposite result in Wilder. While maybe the methodology has changed, the holding in Wilder still seems to exist. What I can't figure out is even if you're right, posit for a minute you're right, blessings gone. Posit for a minute that if we were writing on a totally clean slate, that it doesn't create individual rights. What do I do with the actual holding of Wilder? Yeah, three thoughts on that. First, the holding there was not that you always had a private right of action in the Medicaid Act, but simply that the scheme was not comprehensive enough to foreclose it. So that means that in any future case... It's applying the same language in 1396AA, must. It says that that must is what creates this binding obligation on the state. Posit for a minute that I think that makes no sense, but it is also what the Supreme Court quite clearly said in Wilder. It's much harder to say that the result holding there has been overturned. Forget about whether blessing and the three factors have been overturned, but the result in Wilder still seems to control. The Supreme Court in Armstrong also expressly disavowed that portion. I mean, totally fair, right? But obviously in dicta, right? It's talking about a claim that's not even before the court in Armstrong. One argument, I'll posit to see if this was one that you buy, is that after Kennedy v. Bremerton, this idea of a case being long abandoned means that cases no longer get overruled, they just get ignored. And if they're ignored, we should treat them as being long abandoned, like lemon. And so maybe Wilder should be treated like lemon, as they did in Kennedy. Is that the theory? Well, certainly, Tlefsky treats blessing in Wilder that way. It's going off in a completely different direction. It's not expressing that way, because blessing sets out a test, right? But Wilder doesn't mention Wilder, right? And I get blessing gets its test from Wilder, but the actual application in Wilder doesn't show up. Right. I think Armstrong's disavowal is a part of that. And then I think in Tlefsky, when it says you have to look at the entire statute, and so it's not enough, even if you were to accept that Wilder is binding on this court, which I don't think it is. If you look at everything in context, it doesn't have the unicorn language like FINRA does, the right of each nursing home resident to choose. But Tlefsky doesn't really look at the whole statute, right? It looks at the must language, right? Because the language that Tlefsky is looking at is the equivalent of the must. That's not quite right. So Tlefsky looks at three different things, and let me juxtapose each of those with what we've got here. First, Tlefsky looks at what the provision is embedded in, and it's embedded in a litany of requirements relating to residents' rights. So that looks very different than our plan must have these 87 things. That's number one. Number two, it looks to the language of the subprovision. There you had a right to be free from restraints, a resident's transfer and discharge rights, the right of each resident to choose a personal attending position. We don't have that rights-creating language in the Any Qualified Provider provision. So even if you take Wilder at its face value, that half sentence in AA23 is not enough. The third thing that Tlefsky did is it looked at the general context of the statute. So, for example, it says in 1396 RF1, state plans must protect the rights of nursing home residents. Now compare that to the greater context of our statute. In 1396 AP3, it says that a state can exclude a provider who refuses to enter into or renew a provider agreement. So this is a provider who hasn't even done the first step necessary to be qualified. And yet under the plaintiff's theory, a beneficiary would be able to bring a 1983 action to challenge that exclusion, even though it's the provider's fault that they're not qualified. So when you look at the umbrella, when you look at the specific statutory language, and when you look at the context of everything, this runs exactly the opposite way of Tlefsky. So I totally, so fine, but I'm still, I've still got Wilder, which is, I think, a statutory interpretation case that has interpreted like a provision within this same set of 87 things. That provision is no longer there, obviously, but it's the same 87 things. And it's using the intro to that, just like Tlefsky used the intro to it, right? They're different words, but it relied on the intro. And it interpreted that intro in that context as creating a binding obligation on the state. In conjunction with the subprovision it was analyzing. Which included no reference to individuals at all, best I can tell. And individuals is not the magic word here, because in Contaga, FERPA had the word individual and individuals in it. And yet that wasn't enough to establish, I'm sorry, to have clear rights creating language in that case. But here, again, just put our provision against the choice of provider provision in Tlefsky. I understand that. You keep going there and I totally get it, right? Like, I understand that argument. I just want, just one more time, and I know you're way over time, but what would you have us say has happened to Wilder? The, like, result holding of Wilder? I mean, there are a couple of options, but what do you think, in order to prevail, if I think Wilder is a substantial problem for your position? Like, what would you respond if I said, listen, good arguments, but you haven't addressed Wilder? Like, give me the sort of take home of what you would say. Armstrong repudiates Wilder. Second, Wilder doesn't create the rule for every single case under the Medicaid statute. You still have to look at the language in context. And third, when you look at this language in context and you compare it to the operative test today, which is Tlefsky, it fails miserably for the high bar, high standard, unequivocal language that Tlefsky applies. Those were the three things that I would say. Thank you, Counselor. Thank you, Your Honors. Thank you. Mr. Kupfer, happy to hear from you. Good morning, Your Honors. Good morning, Your Honors. Avi Kupfer for the Appellees, Planned Parenthood, South Atlantic, and Julie Edwards. This Court has twice applied the Supreme Court's framework for determining whether the free choice of provider provision unambiguously confers an individual right enforceable under Section 1983, and its preliminary injunction holding is still the law of the circuit and the law of this case. I guess the first question I have is we have an opinion in Tlefsky where explicitly Justices Thomas and Alito and Barrett and others, Gorsuch, have indicated that this is a high bar for private right of action. And the Supreme Court is obviously very, and we have to take into account that they're very skeptical of private rights of action and that in the absence of unambiguous rights creating language, we would be putting words into Congress's mouth because the end of the Congress which has enacted the substantive standard here in this Medicaid statute is also in control of the means of enforcement. And unless they're very, very clear that a private right of action is a means of enforcement, are we in danger of simply putting words into Congress's mouth that Congress didn't intend? I mean, obviously, the Supreme Court is skeptical of these. And so how do we deal with that? Well, Your Honor, that skepticism exists before Tlefsky as well. The court in Tlefsky quoted the language from Gonzaga saying that these rights are rare, that these statutes that confer rights enforceable under Section 1983 are rare. And this court has twice taken that guidance to heart. I understand that. But given that the Supreme Court is skeptical in it, and the private rights of action are the exception and not the rule, and the Supreme Court doesn't want these things to be in a position where the exception swallows the rule. What kind of limiting principle can you propose to us that would restrain courts under discernible guidelines from simply inferring a private right of action in this case and that case and the other? Because I think we're going to have to, that you're going to have to convince the Supreme Court that the private right of action can be recognized here without throwing open the floodgates. And in order to do that, you're going to say, all right, here is a clear and discernible limiting principle that is not going to just open the gates wide. What's the limiting principle? Well, Your Honor, I think there are four primary limiting principles most clearly enunciated in the concurrence by the Chief, joined by Justice Barrett. And these are limiting principles that this court applied in its previous opinions because they come from Gonzaga. The first is that the focus has to be on the individual beneficiary. As this court recognized, the free choice of provider provision is focused on the needs of individual Medicaid recipients. The second limiting principle is that it has to include rights-creating language that is articulated in definite and specific terminology. Is that a limiting principle or is rights-creating language something that's left to the discretion of the judicial beholder? Is that a limiting principle or an elastic principle? I mean, every limiting principle is going to require some application in the individual case by the judge or judges that are reviewing the text of that provision. But I would posit that there are languages that have perhaps language that looks like it's creating a right, but it is ambiguous. It is not sufficiently definite. So you're giving two suggestions on limiting principles. You said there were four, so go ahead. There are two more. Second, the provision cannot have an aggregate focus on system-wide performance or policy. The provision at issue in Gonzaga was concerned with, quote, the policy or practice of educational institutions. Title IV-D at issue in Blessing was concerned with aggregate compliance with child care programs. Here, the provision is focused on the needs of particular individuals, not the policy of states when it comes to executing their Medicaid plans. And this court distinguished the Gonzaga on that basis. So your view is that the focus of the statute on particular individuals leads one more in the direction of a private right of action than a focus upon the class. Correct. It's focused on the individual case, not some general policy. And that has always been, if you look at the Supreme Court's decisions where the court has found that rights didn't exist, Gonzaga, Blessing, Sutter versus Artist M. Those are the most recent Supreme Court cases that went out the other way. It's interesting that the context of Tulefsky and the context here, they're both, both cases deal with the provision of health care. We're not dealing with wildly disparate factual contexts. And it may be that there's something to be made of the fact that, well, the Blessing is overruled or not. I think it's certainly been put in the shadows. And Gonzaga, as we tried to indicate in our previous cases, Gonzaga is the more applicable precedent. But that still hasn't eliminated the fact that Blessing is overruled. That still hasn't eliminated the fact that some weight and some credibility has to be given to the fact that Congress intended to benefit certain individuals in terms of their health care and their health needs. And those statutes are very likely to be aimed at individuals, whether they be in nursing homes or whether they be in senior centers or whether they be Medicaid recipients such as this. And even if Blessing is overruled, it doesn't mean that you can accord no meaning at all to the obvious class of beneficiaries. And within that class of beneficiaries, it says Medicare plan must provide that any individual, that any individual. And it's not, it's not something that says it must provide that a general class of beneficiaries would have that right. So, all right, that's another possibility of limiting it in the context of a health care or a provision of health care to plan. You said there was some other limiting principles, and I'd be interested in hearing those. That's correct, Your Honor. I want to make one brief point in response to the point you just raised, that there's something unique about the medical context. Congress recognized that. In 1994, Congress passed the Sutter Amendment and amended Title 42 to say that a provision isn't, quote, unenforceable just because it's included in a section that specifies state plan requirements. And this court quoted that provision in rejecting the state's arguments in the last go around. But to your immediate question, Your Honor, the other limiting principles, the other one that was raised both in the Tlaibski majority and in the Chiefs. In light of Tlaibski, there's an administrative mechanism that's set up here, and the administrative enforcement is set up in several different ways. First of all, they have to approve, the secretary has to approve the plan. And the secretary is also given the option of a fund cutoff, and the individual, I was, well, I suspect that the state would be the one to appeal the fund cutoff. But it's, there's a provision for a fund cutoff and an appeal to that. So the administrative mechanism here is not just casual, it's quite elaborate. And is that compatible with a private right of action? Your Honor, I think there's a really important framing point I need to make in answering your question. The state raises the fact that there are other enforcement mechanisms as a reason for why there's not an unambiguous conferral of a right. That is not how the test works, with respect. Tlaibski is clear that you look at the statute to determine the language of the provision itself to determine if there is an unambiguous conferral. Only then, once you determine that there is an unambiguous conferral of a right enforceable under 1983, do you look to whether there are other enforcement mechanisms that may indicate that Congress impliedly preempted 1983 enforcement. And if those enforcement mechanisms are incompatible with 1983 enforcement, then the statute can't, the provision, the right can't be enforced through 1983. So the state puts that issue in the incorrect place in the test. Tlaibski is very clear here. Counsel, if we had a new case today that didn't involve the Medicaid Act, but it's a different act, and it was filed in a district court, would the district court apply blessing? So I'm going to take away the history of this case and any law of the case discussion or any of that stuff, right? New case, different statute, but same words, right? Or effectively the same words. Would the district court apply blessing? Yes, it would, Your Honor. So would it also, would that same district court, in your view, apply the Lemon test to an establishment clause case? Your Honor, as you mentioned... No, no, but first start, would they? Your Honor, I haven't studied the Lemon test in detail in preparation for this case. I would be happy to follow up with an answer to that question in writing. You don't need to do that. That's okay. If I could just make two points that I think will respond to your question, Your Honor. First is, in your concurring opinion during the preliminary injunction, you said that this court does not lightly conclude that the Supreme Court has taken the extraordinary step of overturning one of its precedents. If you had read it, I would talk to you about why maybe that's not true after Kennedy, but I don't want to distract you from your argument. Go ahead. My point is just that it would be a very big deal if the Supreme Court was overturning a precedent. And I think Judge Wilkinson's characterization, Judge Wynn's characterization is spot on here, that clearly the Supreme Court is saying that the emphasis is on Gonzaga and the requirements laid down in Gonzaga. And Tlefsky was an easy case. There was no occasion for the court to change the law. The court was, there's just a simpler explanation. It was applying the existing standard to the nursing facility provisions at issue in that case. And if you look at Gonzaga itself, it did two important things. It clarified the law because lower courts had been misapplying the blessing factors to require something less than an unambiguous conferral. And second, Gonzaga very clearly said, quote, the blessing factors guide the judicial inquiry into whether there's been an unambiguous conferral. And Judge Wynn noted, the blessing factors are all just indicators of statutory analysis. They're not some, as counsel said, amorphous factors existing in the ether. They are pure statutory analysis. How does that come into play when you look at Tlefsky and you, to the extent that it looked at blessing, it's like, it does not even discuss the second factor, the big amorphous factor there. And how do we view that in terms of how the Supreme Court, because you're looking, even in our prior decision, we made it clear that this statute unambiguously conferred a right to support a cause of action. So we went under not only blessing, but we also went under Gonzaga's. And I think in the reply brief, the defendant seemed to indicate that you don't need the word right in order to confer an enforceable right in this context. So I, you know, when we, you know, we as appellate judges, we get these cases and then it seems to be, if you already have a direction you want to go, you then seek for ways to, what fits here and what fits there. But when we look at what we're dealing with, the end result, even in our case here, we didn't stray from the whole premise that we must seek it to determine if there's an unambiguous right. We applied Gonzaga's. We applied that. And the question being, is when the Supreme Court looked at it, some of it had to do with the fact that there had been courts that have strayed from this. They begin to look at, well, we're looking more at intent of the Congress. And I think the Supreme Court, by looking at the factor one and three and not getting in this vague and amorphous business here, they were beginning to collapse. They collapsed those factors. So to the extent that anyone want to say, well, we're not going to just ignore blessing when there's no explicit overruling of blessing. There's nothing there that really goes, we didn't take it and run with it and says that doesn't exist anymore because we're going to infer or it seems to come from the language or it seems to indicate that. And we can do that in any strict and forceful way we can. But at the end of the day, the court did not overrule blessing. It seems to have clarified it in terms of how it interacts with Gonzaga's. And that's a simple thing. We look at the text. That's exactly where we go with it. The previous opinion, we made it clear. We did just that. We understood that there were problems with blessing. We understood those factors and how they factored in. But the end result is it will look to determine if that statute conferred a right. Is that not the direction we went in? That's precisely correct, Your Honor. And as this court amply laid out in an entire section in its preliminary injunction opinion, there's a long history of Supreme Court decisions providing guidance to the lower courts on how they're supposed to go about identifying the rare provisions that unambiguously confer these rights. And I think the best way to see Tulefsky is another in these series of provisions, a series of Supreme Court cases that is clarifying. I do think Judge Wynn is absolutely correct in what we did in our previous decision. We were not generalized intent, but we were textual. We were textualist. And we analyzed it textually. The question I have here is if this language doesn't create, if this text doesn't create a private right of action when it says a Medicaid plan must provide for any individual who may obtain this, and then it goes on to talk about qualified. If that language doesn't suffice as rights creating language, I wonder what language would suffice. It seems to me that almost puts us in a magic words kind of box that Congress has to use the words private right of action in the statute in order to create a right. But the Supreme Court didn't go that far. I think it eschewed a magic words kind of analysis in favor of a textual, in favor of a textual exegesis. And so I keep thinking, you know, if in the context of a statute whose clear aim is to open up as far as possible a freedom of choice on the part of our less fortunate, our impecunious citizen and to give them a sense of freedom in their health care. And if this doesn't suffice to create a private right of action, aren't we back in the magic words? And the Supreme Court didn't say magic. They didn't, they didn't go that far. I think that's right, Your Honor. If you look at every one of the recent Supreme Court precedents, finding an enforceable right under Section 1983, none of those other decisions were dealing with statutory provisions that use the magic word right. Gonzaga laid out what it viewed as somewhat the platonic ideal of rights-creating language. It said no person shall be subject to discrimination. And this Court in its previous opinion said that this statutory provision we're dealing with in this case is equally clear, equally unambiguous in conferring rights-creating language. I would posit that it's even more clear because it's put in the active rather than the passive voice. This says that the individual may obtain care. If on the middle of the year, so the Secretary approves a state plan, and then, you know, midway through the year, the state does something inconsistent with that plan, what's the remedy? Right. The state, the state plan, when it was approved, right, did all 87 things, right? Checked them off. The plan was written out and it said all 87 things just perfectly. And then halfway through the year, the state changes its plan and says, you know, number 42, we're not doing that anymore, right? Because it's too expensive or whatever reason. No reason at all. What's the remedy? Well, Your Honor, there are several potential. What's the Secretary's remedy? Let's start there. Your Honor, I believe the Secretary could choose to disapprove a plan that doesn't comply with the mostly administrative requirements under Medicaid. Right. So it would, the Secretary would have that judgment as to whether it's substantially complied or not. Correct. But the question for our purposes. Could the Secretary seek to reclaim money that had already been reimbursed? Your Honor, I don't know the answer. I don't have the answer to that question at my fingertips. But the question for your statutory interpretation purposes is whether, once this Court has identified an unambiguously conferred right, it has determined in Part 2 of the test laid out in Tulesky, whether Congress impliedly preempted that right through a comprehensive enforcement scheme that is incompatible with 1983 enforcement. And the ability of the Secretary to withdraw funding. I totally got it. I'm at Step 1, not Step 2. So one more question. Do you agree that for there to be a right, there must be a corresponding obligation on somebody? So like in Tulesky, right, the right was the residence and there was a corresponding obligation on behalf of the nursing home to not restrain. Right. In order to have a right, you must have a legal obligation. I have two responses, Your Honor. The first is the one that the Tulesky Court gave and that this Court has given twice, which is that a provision does not fail to secure a 1983 enforceable right just because it places requirements on other actors. The Court was very clear. But the second point I'd like to make is that… Not just because. In fact, it has to. In order to be a right, it has to impose an obligation. My point is that in order to have a right, you have to have a legal obligation. I may answer your question, Your Honor. It is difficult to imagine a right that is enforceable under 1983 that doesn't also place an obligation on someone else. Otherwise, who will you bring a lawsuit against? Every one of the Supreme Court's recent precedents identifying 1983 enforceable rights also placed requirements on other actors. Title IX… I understand that, but you say it's difficult to imagine, but you're not agreeing with my question. I'm saying, if there's a right, must there be an obligation? And you say, I don't know, it's just hard for me to imagine, but no answer, right? Do you agree or disagree? Does a right require an obligation or not? With respect, Your Honor, I'd like to study that question that was outside the scope of the briefing before giving an answer on the spot, but I would give the same answer I gave. Every recent Supreme Court case identifying a 1983 enforceable right also imposed obligations on other actors, and it's difficult to imagine one that wouldn't because, again, who would you bring an enforcement suit against? I see I'm well out of time. Let me ask you, what is ambiguous about the word must in the Freedom of Choice provision such that we have to look contextually and conjure up other type of phrases or how this is functional under the statute? Is that what we do when we are looking at the text and if it's plain? Is it not plain? Your Honor, I think you're getting to one of the limiting principles that was identified in Tleskey. Is the right articulated in definite and specific terms? Here, as you mentioned, this Court has done the textual analysis twice and found that it is. It says that the state plan must provide that any individual may obtain assistance from their choice of qualified provider. Congress, as this Court has noted… You heard counsel on the other side articulate another factor that sort of cabins what appears to be plain language, and if we can do this with this statute, does that give us the way to do this with other statutes? It looks pretty plain to me, but if we know there are other things there, are we allowed to then import that into the meaning of something that looks plain? No, Your Honor. There are four textual limiting principles. It really has to be focused… How is it done here? I'm trying to understand. Your opposing counsel made that, as I said, it was quite eloquent. How is that done in terms of this plain language here? Judge Wilkinson pointed out right from the beginning. Medicaid plan must provide. It looks pretty plain to me. Then, you can't just settle there. You've got to look at what the Secretary of State does, how South Carolina does it, the whole bit. If we can do that here, can we do it in every case? I'd like to know. My biggest problem in terms of how we deal with cases, I want every case to be dealt with. We're going to do textualism like this. Let's make sure we do it in all the cases, not just this one, or find some specific little nice reason or exception that we can do it here because this is the way it is or the Supreme Court has said it can be done. If the Supreme Court says it's done, then you've given us an opening to say we can do it otherwise. Is that not where this would go? I think you're correct, Your Honor. I think the Supreme Court has articulated a clear test. It's the test that it has been, quote-unquote, crafting since 1980 in Maine v. Stibbitt Out. This court followed that test and applied it correctly twice already in this case. Unless there are further questions. Thank you. Thank you very much. We'd like to hear from Mr. Burch and Rebuttal. Thank you, Your Honors. First, Judge Richardson on the Wilder point. I think the Fifth Circuit en banc has already done the work that we were talking about in its Planned Parenthood case. This is 981 F. 3rd at page 359. And they say, in Armstrong, the Supreme Court disavowed in part its decision in Wilder, declaring in Armstrong that our later opinions plainly repudiate the ready implication of a Section 1983 action that Wilder exemplified, see Gonzaga. And so there they limited Wilder to that specific provision and they did their own textual analysis under Gonzaga of the same provision we're looking at here. And 11 judges on that circuit all agreed with the position of South Carolina. Do you have a case that would bind us? The Fifth Circuit does not. Please allow me to ask my question before you proceed to answer. You asked me earlier, so allow you to now answer. Hear my question, then you can answer. There's nothing binding about that Fifth Circuit. Nice possibility of guidance, but that doesn't bind anyone. It's not so in the Fourth Circuit, correct? Correct. Anything that is so for the Fourth Circuit that carries the weight of what you just said? There is not. However, I would say, Judge Wynne. Then I'm comfortable with your answer. Okay. What I would say, Judge Wynne, is that in Talevsky, there was no circuit split on the language of FINRA because it wasn't ambiguous. It clearly had the rights-creating language that was required, the high bar. The reason that the circuits are split on this provision, the Any Qualified Provider provision, with the en banc circuit on the two-circuit side, is because there is ambiguity. And if there's ambiguity, then we don't imply a private right. The basic principle of contract law, the disagreement among litigants or disagreement among circuits or whatever, does not in and of itself create an ambiguity. We see these arguments all the time in contracts cases where the parties say, well, we're disputing this language. There must be an ambiguity. That's not necessarily so. Disagreement is not a concession of ambiguity. I agree, but the fact that 11 judges on the Fifth Circuit and two on the Eighth Circuit went the other way at least suggests that it's not as clearly unambiguous as the plaintiff suggests. I don't want to take too much of your time here, but let me just ask the one question about the Armstrong point. The challenge there is it doesn't quite say what we would want it to say if it was really saying Wilder is no longer a good law, even in dicta, it doesn't seem to say that. And the challenge is that it cites the Gonzaga. And Gonzaga does have two, like, rubs with Wilder and Blessing, right? But they're sort of specific rubs. They're not at the holdings of those cases. They're at the zone of interest in the one context and the relevance of the private right of action in another context. Can I really read the footnote in Armstrong, even if it wasn't dicta, as doing something more than what Gonzaga really did? I think you can, because what the Fifth Circuit says is based on everything the Supreme Court has said since, and Talevsky only reinforces that, we're going to limit Wilder to its actual provision. We're going to limit it to that case. And going forward, we're going to apply the appropriate test, the Gonzaga test, the Talevsky test, which is now the high bar. And it simply doesn't satisfy that in this context when you put the whole thing together. And context is something that I wanted to bring up because Judge Wynn was talking about the must being clear. But it's not as clear when you take that language and you put it with the rest of the language in that provision, which is directed to what the plan must contain and what the Secretary must enforce. A couple of other quick points, Judge Richardson. No lower court would apply Lemon because in Kennedy, the Supreme Court said the test is history and tradition in Establishment Clause cases, not Lemon. Likewise, in Talevsky, the U.S. Supreme Court said the test is Gonzaga. So Blessing, Wilder, they're not the test. Other points, Judge Wilkinson, you asked about limiting factors. My friend mentioned individuals. As I've already mentioned, individuals was also a term in the FERPA statute at issue in Gonzaga. They were also obviously the class of beneficiaries, the students who were benefited by the privacy protections. That wasn't enough to create an individual right there. He also suggested the medical context is unique. Well, O'Bannon, the Supreme Court held that a Medicaid beneficiary has no enforceable expectations of continued benefits for care in an institution determined to be unqualified. And so that medical limitation is not. Excuse me just a second. Yes. We've talked a lot about Blessing and whether it's overruled or not. But even if even if we would say, well, yes, Blessing has been de-emphasized and Gonzaga is the case. There's the initial point and that is our earlier decision proceeded, I think, on that premise. And if Blessing has been brought into disfavor, that still doesn't relieve us of the fact that some of it retains some vitality. The question is, what is that vitality? And I would suggest that the vitality is to ask ourselves two questions. One is, what did Congress mean to accomplish in this statute? And how did it mean to accomplish the end? In other words, it seems to me to we have to ask an end means inquiry. And it seems to me that when you ask what the end was, the whole purpose of the statute was to provide our less fortunate citizens the freedom of choice as to their access to qualified medical care. All right. That's patently the end. But that's not that's not enough. The Supreme Court saying Blessing indicated it was an awfully strong factor. But that's not enough. You have to have textual means to the end. And we've fastened on this provision, which relates to the individual, which provides an obligation and what seems to be a remedy in terms of rights creating language. But there seems to be a conjunction of ends and means here that says Congress wanted to afford our less fortunate citizens free choice of medical qualified medical providers. And they did this not only in the state and the administrative mechanism, but with some very strong individually oriented language, which where you have to contrast the must on the state and the may for the individual. And so I think the means and the end link up. That's that's the that's that's where I see it. Now, I like to give you the last word. So you tell me why you think I'm horribly wrong. Two reasons, and you're not horribly wrong, just mildly wrong. The first is that Miss Edwards has, as I mentioned, more than 100 providers that she could go to. No one is being deprived of any care. But more importantly, specifically to your question, what did Congress intend? Contrast the choice of provider provision in this statute with the one in FINRA at issue into Levski. Again, I'll give you the citation. Forty two U.S.C. 1396 small r c 1 a 1. There, Congress said the right of each nursing home resident to choose a personal attending physician. That's the kind of hyper focused rights creating language that the Supreme Court said is sufficient. We don't have that here. And when Congress use different language, we have to assume that was intentional. All right. Thank you very much. You have any further questions? Judge. I'd like to thank both of you for what I thought were very fine arguments. And we have real pleasure to have you. I'm under doctor's orders not to circulate broadly because of all these viruses floating around. But that doesn't mean I appreciate any less the good quality of both of your presentations this morning. And I hope you'll let me wish everybody at council's table a happy holiday season and everybody on the benches. Besides, my colleagues probably come down and shake hands with you. I'm going to stand with Judge Wilkinson on this as a colleague and wish you a Merry Christmas. Thank you. Richardson. I don't have a choice now, do I? I'm going to stand with them, too. Here I am. Merry Christmas. Thank you, Your Honor. Merry Christmas. Thank you. Thank you. Thank you.
judges: J. Harvie Wilkinson III, James Andrew Wynn, Julius N. Richardson